# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>IRINA BELENKOVA,<br><br>                          Debtor | Chapter 7<br>Case No. 12-17475-FJB |

### MEMORANDUM OF DECISION ON
### MOTION OF CHAPTER 7 TRUSTEE TO COMPEL TURNOVER

By the motion before the Court, the chapter 7 trustee, John Desmond (the "Trustee"), seeks an order compelling debtor Irina Belenkova or her stock brokerage, Scottrade, Inc. ("Scottrade"), to turnover to him the securities and other assets in her brokerage account.  The Trustee maintains that these are assets that belonged to Ms. Belenkova when she filed her bankruptcy petition or proceeds of such assets; that they are consequently assets that he may use or sell under 11 U.S.C. § 363; and therefore that they are subject to turnover under 11 U.S.C. § 542(a).  Ms. Belenkova opposes the motion, contending that (i) the securities belong not to her but to Astral Enterprises, Inc., a corporation of which she is sole owner, or to her mother; (ii) that, even if they are hers, they are not assets she held at the time of her bankruptcy filing or proceeds of such assets but the fruits of postpetition earnings; and (iii) even if they are hers and are assets of her bankruptcy estate, they are exempt.  After an evidentiary hearing and for the reasons set forth below, the Court will grant the motion.

## PROCEDURAL HISTORY

I recount the travel of the bankruptcy case and of the Motion for Turnover in some detail because Ms. Belenkova argues that she has not been afforded a fair chance to present her case in opposition to that motion, and because it bears on issues of credibility.

a.      **Commencement of the Case**

On September 12, 2012, Ms. Belenkova filed a voluntary petition for relief under chapter 7 of

the Bankruptcy Code, thereby commencing the present bankruptcy case.  At the time, she was

represented by counsel.

With her petition she filed (among other things) schedules of personal property, current income,

and current expenditures, and a statement of financial affairs (her "SOFA"), all of which she signed

under penalty of perjury.  On her schedule of personal property, she indicated that she had assets in

only seven categories:  cash on hand of $30; cash in a checking account of $3000; a rent deposit (held by

her landlord) of $1500; household goods with total value of $450; wearing apparel and jewelry with

total value of $1,000; a 2011 Acura RDX automobile that she valued at $20,000—and which in her

schedule of secured claims she indicated was encumbered by a lien of $22,300; and a 100 percent

interest in an entity identified as Astral Enterprises, Inc., which interest she valued at $0.  As to all other

categories of assets—including "stock and interests in incorporated and unincorporated businesses,"

"interests in IRA, ERISA, Keogh, or other pension or profit sharing plans," "government and corporate

bonds and other negotiable and nonnegotiable instruments," and "accounts receivable"—she expressly

indicated "none."

In the section of her SOFA that asked her to list "all property owned by another person that the

debtor holds or controls," she indicated "none."  In the section of her SOFA that asked her to list "all

financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which

were closed, sold, or otherwise transferred within one year immediately preceding the commencement

of this case," she indicated "none."  In the section of her SOFA that required her to list "all financial

accounts and instruments held in the name of the debtor or for the benefit of the debtor which were

closed, sold, or otherwise transferred within one year immediately preceding the commencement of

this case," and expressly instructed that she "include . . . shares and share accounts held in . . .

brokerage houses and other financial institutions," she indicated "none."

On her schedules of current income and expenditures, she indicated that she was unemployed,

supported herself and a single dependent (a son), had total monthly income—apparently from

unemployment compensation, but she did not specify the source—of $2938, and had monthly

expenditures of $3492.  On her SOFA, she also indicated that she had total income from employment,

trade, profession or operation of her own business in 2012 (through the date of her bankruptcy filing) of

$7,000 and in 2011 of $37,448; and she further indicated that her total income from all other sources in

the two years immediately preceding the commencement of her bankruptcy case was "none."

Joseph Braunstein was appointed chapter 7 trustee in the case.  He presided at the first meeting

of creditors and, after investigating the debtor's financial affairs for some time, moved to employ

counsel, his own firm of Reimer & Braunstein LLP.  Ms. Belenkova, now acting pro se, opposed the

motion and moved for the appointment of a new trustee—she faulted him for (i) investigating her

financial affairs and (ii) not recovering for her certain assets that her divorce proceedings had put

beyond her reach.  The Court denied as baseless the motion to replace Braunstein as trustee and

granted his motion to employ counsel.

Around the same time, her attorney moved for leave to discontinue his representation of her,

citing irreconcilable differences as to how to proceed in the case and an irrevocable breakdown of

communication.  The Court initially denied the motion, but when counsel later renewed it with more

detail—including allegations, which I found to be true, that Ms. Belenkova had become loud, aggressive,

and erratic in her behavior toward him and refused to leave his office, such that he had had to call police

to have her removed—permitted his withdrawal from representation on April 23, 2013.  From that date

through the present, and despite repeated admonitions to obtain the advice and assistance of

replacement counsel, she has represented herself in this case.

b.    **Trustee's Investigation and Attempts to Obtain Records**

On April 29, 2013, trustee Braunstein moved for authority under Fed R. Bankr. P. 2004 to obtain

documents from the brokerage Charles Schwab & Co. ("Schwab") regarding an account to which Ms.

Belenkova had apparently transferred assets in December 2011.  In support of this request, Braunstein

recited that, in response to inquiries he had made into certain stock transactions that were disclosed on

her tax returns, Ms. Belenkova had produced statements from a personal account that she had

maintained at the online brokerage E*Trade, and from these statements he had identified a transfer

made on December 7, 2011 to a Schwab account.  Ms. Belenkova having filed no objection to this

motion, the Court granted it on May 15, 2013.  On June 24, 2013, Ms. Belenkova filed a late objection[1]

and motion for reconsideration, which the court denied.

On June 20, 2013, Braunstein, having received the requested documents from Schwab and

determined that the Schwab account was registered to Ms. Belenkova, moved to compel her (i) to

produce documents necessary to explain the transfer of substantial sums into and out of the account in

September and October 2012 and (ii) to generally cooperate with him in the administration of the

estate.  Ms. Belenkova neither timely objected nor attended the hearing on the motion.  After the

hearing, on July 24, 2013, the Court granted the motion by directing Ms. Belenkova to adduce, on or

before August 5, 2013, all documents in her custody, possession, and control pertaining to the October

2012 transfer of approximately $254,000 from the Schwab account.

Ms. Belenkova later moved to continue the hearing on the motion to compel and, when that

was denied as late, to vacate the order granting the motion and reconsider the motion.  As cause to

deny the motion to compel, the motion for reconsideration included the following statement (among

---

[1] As grounds for denial she stated that Charles Schwab & Co. is not a party to the case, that "Court cannot examine
party that is not US resident/citizen and Russian citizen,"  that "it violates Hague Convention rules and
procedures," and that "party needs to ask request the foreign jurisprudential like Russia and Ukraine to obtain
permission to do so."  She offered no justification for the tardiness of her objection or other cause for revisiting the
order.

others):  "He [Braunstein] subpoena account of my mother who is not party of the case.  Case Malin vs.

Malin (App. Ct. 2010-74-P, July 17, 2010 in which court allows to keeps funds under name of children for

temporary purpose up to 10 years when mother in not resident of U.S.)."

On August 20, 2013, Braunstein moved for authority under Fed R. Bankr. P. 2004 to obtain

documents from the brokerage Interactive Brokers LLC regarding (i) an account to which Ms. Belenkova

had apparently transferred assets from the Schwab account and (ii) any accounts she maintained at

Interactive Brokers.  As to this motion, the Court established an objection deadline of September 3 at

noon and set a hearing for September 4, 2013.  Ms. Belenkova moved to reschedule both, saying she

was traveling on business out of state; the Court denied the motion but rescheduled the objection

deadline from noon to 5:00 p.m. and permitted Ms. Belenkova to appear by telephone.  Ms. Belenkova

did file an opposition to this motion.  It set forth no reason why Braunstein should not be permitted to

obtain and examine the records of Interactive Brokers but made a number of factual representations

about the brokerage accounts and transactions Braunstein was investigating.  Among other things, she

indicated that, in addition to the Schwab account that Braunstein was aware of, she had maintained a

second account at Schwab during October 2012 and that what Braunstein had called a deposit into the

first Schwab account of $163,000 in that month was in fact an internal transfer from the second Schwab

account to the first.  She also stated that although the first Schwab account was maintained in her own

name, it was "for" and "intended for" her mother.  Specifically, she stated:

> Although Schwab account in the name of debtor, it represented the
> account for Debtor mother who held temporary in the name of debtor
> because she lives oversees and could not open account here without
> SSI.  Schwab account was intended for mother as mother plans to come
> here and needs to support herself here. . . .  Debtor objected to
> examination of Schwab account by filing timely opposition.  Because the
> mother lives in Russia and Ukraine and does lives in US [sic], Trustee
> violated the rules of Hague procedure.

After a hearing and over Ms. Belenkova's objection, the Court granted Braunstein leave to examine and

subpoena the records of Interactive Brokers.  Ms. Belenkova moved to quash Braunstein's subpoena of

these records—this was in essence a motion for reconsideration of Braunstein's motion—and

Braunstein opposed the motion.  After a hearing and consideration of a reply by Ms. Belenkova to the

objection, the Court denied the motion to quash.

On September 25, 2013, while the motion to quash was pending, trustee Braunstein passed

away.  On October 1, 2013, the United States Trustee appointed John Desmond to serve as successor

trustee in the case and filed a notice to that effect.  Ms. Belenkova filed a "motion to object to" the

appointment of Desmond as successor trustee but stated no basis for objecting to the appointment; the

Court denied this motion on October 24, 2013 without a hearing.[2]  On October 15, 2013, Desmond

applied to employ as his counsel the same firm as Braunstein had employed as his counsel, Reimer &

Braunstein LLP; and no objection having been filed, the Court granted that application on October 30,

2013.

On October 18, 2013, Ms. Belenkova moved to amend her schedule of unsecured creditors to

add some 12 creditors, with debt totaling approximately $80,000 that she had not previously disclosed.

The motion offered no explanation for the earlier omission of these creditors from her schedules.

**c.**      **Trustee's Motion for Turnover**

On October 21, 2013, Desmond filed the motion presently before the Court.  It seeks an order

pursuant to 11 U.S.C. § 542(a) directing Ms. Belenkova and Scottrade[3] to (i) turnover "any and all cash,

shares of stock, bonds, mutual funds, and any other investment owned by or to which the Debtor has

access, including, without limitation, the shares of Apple stock which were transferred to the Debtor's

account maintained at Scottrade, Inc. (the "Scottrade Account"), on or about September 18, 2013,

---

[2] The order stated:  "Denied.  The appointment of a successor trustee is governed by 11 U.S.C. section 703.
Nothing in 11 U.S.C. Section 703 gives the Debtor standing to elect a successor trustee.  Furthermore, the Debtor
states no basis on which to invalidate the United States Trustee's appointment of John Desmond as successor
trustee."
[3] The motion also seeks the same relief against "any other bank or brokerage house or third party who is or may be
in possession of assets of the Debtor," but it identifies no such entities other than Scottrade.

and/or which were or may have been transferred therefrom," (ii) provide an accounting of the Scottrade

Account and any other brokerage account in which such assets may be or have been held, and (iii) allow

the Trustee to pursue costs and fees associated with the turnover should the directed party fail to

comply  (the "Turnover Motion").  The Turnover Motion is based on allegations by Desmond that (i)

when she filed her bankruptcy petition, Ms. Belenkova was the owner of the shares of stock held in a

Schwab account and (ii) the assets in the Scottrade Account are either the same assets as were held in

the Schwab account on the petition date or proceeds of those assets.  Although the Turnover Motion is

rife with allegations that Ms. Belenkova fraudulently concealed these assets from him, Desmond does

not by this motion seek denial of her discharge.  The motion is limited to turnover relief under § 542(a).

The motion is directed at both Ms. Belenkova and Scottrade.  Only Ms. Belenkova has objected.

Scottrade has filed no opposition.

Desmond sought expedited determination of the Motion for Turnover in order to prevent Ms.

Belenkova from further transferring the Scottrade assets or their proceeds to herself or a third party.

Accordingly, he also sought preliminary relief in the nature of turnover of the Scottrade assets for

safekeeping pending a final determination of the Motion for Turnover.

The Court granted expedited treatment, scheduled a hearing on the Motion for Turnover for

October 25, 2013, and required that any objection be filed by October 24 at 5:00 p.m.   Ms. Belenkova

filed a motion to continue the expedited hearing and to extend the time for her to respond to the

Motion for Turnover, but she did not agree to maintain the status quo with respect to the Scottrade

account.  In fact, stating that Scottrade had decided unilaterally to "freeze" the account, she sought to

lift any freeze on the account so that she could use it.  The Court denied the motion to continue the

hearing and accordingly held the initial hearing on the Turnover Motion on October 25, 2013.  Ms.

Belenkova filed no objection to the Turnover Motion before that hearing.

At the hearing she articulated two defenses to the Turnover Motion.  Notably, she did *not* deny—and has never denied—that on the petition date, she held assets in her name in the first Schwab account and that she did not disclose these to Braunstein or Desmond, either in her schedules or otherwise.  Rather, she argued:   (i) the assets in the Scottrade account are neither the same assets as she held in the Schwab account on the petition date nor proceeds of those assets—the original assets had been sold, she stated, and their proceeds used to pay off margin loans—but new shares of stock that she acquired with new margin loans, and therefore they are not property of the bankruptcy estate; and (ii), even if the Scottrade assets are property of the estate, she intends to claim them as exempt.  In order to provide Ms. Belenkova with more time to respond and in order to conduct an evidentiary hearing, the Turnover Motion could not be decided that day.  Nonetheless, the Court concluded, on a preliminary basis, that the trustee was likely to prevail, that he was likely to be irreparably harmed if the account were not frozen pending a final determination of the Turnover Motion, and that the harm to the Trustee would outweigh any harm to Ms. Belenkova.  Accordingly, at the close of the hearing, the Court granted preliminary relief by ordering that the Scottrade account be transferred to trustee Desmond as escrow agent, to hold the same until a final determination could be made on the Turnover Motion.  The order prohibited Desmond from liquidating or using the account assets but permitted him to apply to the Court for authorization if he believed it necessary to take action to protect the value of the account.  In order to minimize possible harm to Ms. Belenkova, the Court scheduled a final, evidentiary hearing on the Motion for Turnover on an expedited basis, for November 25, 2013, thirty days after the preliminary hearing.  The Court also ordered that Ms. Belenkova file a written opposition to the Turnover Motion by November 1, 2013.

She did not file a written opposition by this deadline.  Instead, she focused her efforts on reversing the Court's order preserving the assets.  On October 28, 2013, she moved for a stay of the order preserving the assets.  That same day, the Court denied the motion for stay; in the order, the

Court explained that the assets are liquid, that there was no assurance that the assets would be preserved for a final hearing if the account were not frozen, and that allowance of the motion to stay would be tantamount to a denial of the Turnover Motion because Ms. Belenkova would then be free to dissipate or liquidate the securities.

On the same day, she also filed a notice of appeal to the Bankruptcy Appellate Panel ("BAP") from the order preserving the assets.  On November 15, 2013, the BAP dismissed the appeal on the basis that the order appealed from was neither final nor eligible for interlocutory review.

On November 4, 2013, Ms. Belenkova filed a motion to stay and (again) to reconsider the order preserving the assets.  In support she argued that (i) she believed she could claim the Scottrade assets as exempt, (ii) she might wish to convert her case to one under chapter 13, and (iii) she needed to have access to the account in order to avoid losses to the securities in it.  On November 12, 2013, the Court denied this motion on the stated basis that it articulated no "mistake, inadvertence, surprise, or excusable neglect" warranting vacatur and reconsideration under Fed. R. Civ. P. 60(b), made applicable by Fed. R. Bankr. P. 9024.[4]

Next on November 12, 2013, Ms. Belenkova filed yet another motion to stay and reconsider the October 25 order, but this November 12 motion was identical to her motion of November 4.  On November 18, 2013, the Court denied it as moot in light of the Court's denial of the earlier iteration of the same motion.  In this order, which denied what was essentially a third motion for a reconsideration, the Court directed Ms. Belenkova's attention Rule 9011 of the Federal Rules of Bankruptcy Procedures, noted that it permits the assessment of costs and sanctions against a pro se litigant that files written motions for purposes of delay or harassment, and that filing a duplicate of a previously denied motion violates Rule 9011.  The Court added:  "In the event the Debtor engages in further conduct in violation of Rule 9011, the Court will sanction her with a fine of up to $500 per incident."

---

[4] Nor were her defenses meritorious, but the Court did not address the merits in deciding the motion.

Also, noting that Ms. Belenkova's opposition to the Turnover Motion was seventeen days overdue, the Court added to this November 18 order a further order requiring her to file her opposition on or before November 22, 2013, so that Desmond's counsel would have the benefit of it for at least a weekend in advance of the evidentiary hearing.  Ms. Belenkova finally submitted her opposition to the Turnover Motion (the "Opposition") on November 22, 2013, 21 days overdue, having deprived the trustee of its benefit for virtually the entire period of preparation for the evidentiary hearing.

In the Opposition, she advanced three defenses to the Turnover Motion.  First and primarily, she argued that the assets in the Scottrade account are neither the same assets as she held prepetition in her E*Trade account nor proceeds of those assets—the original assets had been sold, she stated, and their proceeds used to pay off margin loans—but new shares of stock that she acquired with new margin loans, and therefore they are not property of the bankruptcy estate.[5]  Second, she argued, without elaboration, that her transfer in December 2011 of the assets then remaining in her E*Trade account to her Schwab account was "ordinary and necessary trading business activity on the behalf of entity which is not part of Chapter 7 Bankruptcy Estate, and represents Trading and consulting business for account in Debtor's name."  From this, I understand her to contend that the E*Trade assets—and presumably also those in her Schwab accounts on the petition date—belonged not to her but to her wholly-owned business, Astral Enterprises, Inc., which is not the debtor in this or any bankruptcy case, and therefore do not belong to the bankruptcy estate in this case.  Third, she makes the point that the value of assets she transferred from a Schwab account to her Interactive Brokers account in October 2012 was not $245,000, as the Trustee alleges, but the value of the transferred stock *less the amount of the margin debt that then encumbered it*, a considerably smaller number.

---

[5] It is unclear why the focus of this argument is the prepetition account she maintained at E*Trade.  Desmond does not contend that she continued to hold assets in an E*Trade account on the petition date.  What he seeks to recover is assets that she held on the petition date in a Schwab account, and the proceeds thereof.  The prepetition liquidation of assets is irrelevant.

On December 3, 2013, after the first day of the evidentiary hearing but before the second and final day, Ms. Belenkova, without leave of court, filed a "Memorandum" in support of her opposition (the "Supplemental Opposition"), which set forth new arguments against the Turnover Motion.  In the supplemental Opposition, Ms. Belenkova made the following significant allegations and arguments:

1. The assets of the Scottrade account are excluded from the bankruptcy estate by § 541(a)(6) because they are earnings from services performed by an individual debtor after the commencement of the case; they "represent Debtor tremendous efforts post-petition and services performed by Debtor post-petition" (Supplemental Opposition, ¶¶6, 10, 12-13);

2. The shares of Apple Inc. stock ("AAPL") that were in the Schwab account on the date of the bankruptcy petition were sold by the brokerage firm Interactive Brokers in early 2013 to pay off margin debt; the 311 shares of Apple stock presently in the Scottrade account were purchased postpetition, in November and December 2012 and August 2013, "with new, borrowed money" and consequently are not property of the estate or proceeds of property of the estate (Supplemental Opposition, ¶¶6,12-13);

3. The assets of the Scottrade account are excluded from the bankruptcy estate by § 541(b)(1) because they are a power that the debtor may exercise solely for the benefit of Astral Enterprises, Inc., an entity other than the debtor (Supplemental Opposition, ¶¶7,10-11);

4. Likewise, the "Schwab Account was open in December 2011 and funded with business money and was not used for personal investment, living expenses or trading" (Supplemental Opposition, ¶20);

5. "The Schwab account *14 is not property of the bankruptcy estate and should be exempt as pursuant § 522(C)(D) as $39,540 IRA rollover money from May 14, 2012 were in one year automatic stay" (Supplemental Opposition, ¶8); and "Schwab account also holds temporary retirement money.  On May 10, 2012, Debtor temporarily rollover her IRA account into

Schwab from Etrade in amount of $39,540 in stock 2000 TZA.  Schwab in error misused

funds to cover short sale on account.  Debtor requested automatic stay for IRA 60 day

rollover and request Court to exempt and exclude $39,540 from Scottrade value"

(Supplemental Opposition, ¶29); and

6.   "Debtor request to open account in name of corporation was denied in on grounds:  (a)

corporation must be 2 years in business; (b) Corporation must be profitable and

demonstrate income, earnings and stable growth.  (Exhibit B)"[6] (Supplemental Opposition,

¶28).

Desmond promptly moved to strike the Supplemental Opposition as late, and prejudicially so,

given that he had already presented his case; Desmond argued that notwithstanding her *pro se* status,

Ms. Belenkova is obligated to abide by the rules of litigation.  He further asked that certain separately-

filed exhibits to the motion be stricken.  At the commencement of the second day of the evidentiary

hearing, the Court agreed with Desmond regarding the Supplemental Opposition and accordingly struck

it as prejudicially untimely.  With respect to the exhibits, the Court indicated that it would rule on an

item-by-item basis when and as Ms. Belenkova moved to admit the exhibits.  As she never did move to

admit them, the Trustee's motion to strike the exhibits is moot.

d.    **Evidentiary Hearing**

The evidentiary hearing on the Turnover Motion began on November 25, 2013.  Desmond

conceded that he had the burden of proof, and the first and only witness on his behalf was Desmond

himself.

---

[6] Ms. Belenkova's citation to Exhibit B is not helpful; Exhibit B is comprised of two letters from Schwab
representatives to herself, neither of which includes the language she cites the exhibit for or even concerns a
request to open an account in the name of the corporation.  Ms. Belenkova nowhere indicates which brokerage
she was dealing with in the events discussed in this paragraph.

In addition to Desmond's testimony, Desmond introduced into evidence a series of exhibits, five
in all.  He first offered in evidence Ms. Belenkova's chapter 7 petition and the schedules and statements
she had filed with it in her bankruptcy case.  Ms. Belenkova objected to the admission of these
documents on the limited basis that her lawyer made mistakes in the preparation of the disclosures in
the schedules and statements.[7]  They were collectively admitted into evidence over this objection as
Trustee's Exhibit 1.

Next Desmond introduced into evidence a series of account statements—one for each month
from December 2011 through November 2012—pertaining to an account at the brokerage firm Charles
Schwab & Co.  Ms. Belenkova did not object, and the statements were admitted collectively as Trustee's
Exhibit 2.  The account bore the number *14 (last two digits) (the "Schwab Account").  The Schwab
Account was in the name of Irina Belenkova, the debtor.

Desmond next offered into evidence certain records that were generated and maintained by the
brokerage firm Interactive Brokers LLC ("Interactive") regarding an account maintained by Ms.
Belenkova at Interactive.  Ms. Belenkova objected to the introduction of this evidence; as the sole basis
for this objection, she alleged that she had asked Desmond to provide her with these documents before
the evidentiary hearing, but Desmond had refused and failed to provide them to her.  Desmond
responded that he had sent Ms. Belenkova notice of his intent to introduce these documents under
Federal Rule of Evidence 902(11) on November 12, 2013 and had offered in that notice to make a copy
of the account statements available to her for inspection.  The notice itself was entered into evidence as
Trustee's Exhibit 4.  Desmond's counsel, having been sworn, testified that, consistent with the
requirements of Fed. R. Evid. 902(11), she had offered the account statements to Ms. Belenkova, but
that Ms. Belenkova had never asked to see the documents.  She also testified that she had emailed this
proposed exhibit to Ms. Belenkova on the Friday before the hearing and had again provided her with a

---

[7] Ms. Belenkova offered no evidence at any point in the hearing to support her allegation that her attorney was
responsible for errors in the schedules and statements.

copy of the exhibit on the morning of the hearing.  Ms. Belenkova flatly denied all of this.  She testified

that counsel to the trustee had "refused" to give her copies of the exhibit, that she had not received an

emailed copy of the account statements on the Friday before the hearing, that this (offering a document

but then withholding it) was a "lawyer tactic," and that counsel had conspired with certain lawyer

creditors on this tactic.  After taking sworn evidence from the debtor and counsel to the Trustee, the

Court again decided that counsel was more credible and admitted the Interactive statements as

Trustee's Exhibit 3 over Ms. Belenkova's objection.  All parties admit that counsel gave the debtor notice

of the intent to offer the Interactive account statements.  Exhibit 3 is a group of three documents.  The

first is a seven-page compilation of account information (the "Interactive Account Information Form").

The second is an activity statement for Ms. Belenkova's Interactive account for calendar years 2012 (the

"2012 Activity Statement"), and the third is an activity statement for the same account for the period

January 1, 2013 to October 8, 2013 (the "2013 Activity Statement").

Lastly, the Trustee sought to admit certain records that were generated and maintained by the

brokerage firm Scottrade, Inc. regarding an account maintained by Ms. Belenkova at Scottrade.  Ms.

Belenkova objected to their admission; as her sole basis for objection, she alleged that she had asked

Desmond to provide her with these documents before the evidentiary hearing, but Desmond had

refused to provide them to her.  Again, Ms. Belenkova admitted receiving a notice under Fed. R. Evid.

902(11) from the Trustee in which he identified the Scottrade account statements and offered to

provide them to her.  Counsel to the Trustee stated under oath that she had provided the notice and

that Ms. Belenkova had never asked to see the statements, causing counsel to believe that she already

had these documents and did not wish to see them.  Indeed, the Scottrade account is in Ms. Belenkova's

name and has her home address as the mailing address.  Ms. Belenkova, also under oath, testified she

had not received the account statements that were addressed to her by Scottrade at her home address.

She stated that she had asked both Desmond and his counsel for copies of the Scottrade documents

that were the subject of the notice, but those requests were either never answered or refused.  Again,

the Court finds counsel to the Trustee more credible on this point.  There was no reason to provide

notice of the introduction of the documents and to offer to provide them to Ms. Belenkova and then to

refuse to provide them when they were requested.  Therefore, the Court admitted the Scottrade

account statements as Trustee's Exhibit 6.  Exhibit 6 is comprised of four separate documents:  a one-

page brokerage account application; a three-page options application, including the terms of a Scottrade

Options Agreement which, by this application, Ms. Belenkova was agreeing to be bound; a signature

page for both of the above; and an account statement for the month of September 2013.

Ms. Belenkova's cross examination of trustee Desmond on November 25 was extensive.  It ran

for over three hours on November 25, 2013, and, at the end of the day, showed no sign of nearing

completion.  Because the cross examination had been unfocused, irrelevant,[8] consistently quite

belligerent, at times utterly uncivil, and, for these and other reasons, unhelpful and unproductive—

generally a waste of time—the Court told Ms. Belenkova that, upon resumption of the evidentiary

hearing on December 9, 2013, she would have two hours to complete her case.  Because she had

consistently appeared at hearings grossly late and without excuse, the Court also informed her that her

time would begin to run at the time scheduled for the trial to resume and that, if she were late, she

would have that time deducted from her time for presentation.  She nonetheless appeared at the

December 9 hearing 35 minutes after the time scheduled for the hearing to begin, which resulted in a

loss of 35 minutes of the time allotted to her to make her presentation on that day.[9]

During her cross-examination of Desmond, Ms. Belenkova sought to introduce a number of

records from the Office of the Secretary of the Commonwealth concerning Astral Enterprises, Inc., to

---

[8] She spent most of her cross-examination on transactions in the E*Trade account that long preceded the period at issue, which commences with the bankruptcy filing.

[9] On December 9, the Court also heard a motion by Ms. Belenkova to disgorge fees she had paid to her former counsel; the time spent on this motion did not reduce the time allotted to Ms. Belenkova for her presentation on the Turnover Motion.

show that it was in good standing when she filed her chapter 7 petition and that she was its sole officer,

director, and shareholder.  She had many problems with authenticating the documents through the

Trustee, a hostile witness who had no knowledge of the documents.  At one point the Court suggested

that she might more profitably authenticate them through her own testimony.[10]  On this occasion and

others, the Court suggested to Ms. Belenkova that her time would be better spent testifying to facts of

which she had knowledge than cross examining the Trustee about facts of which he did not, to take the

stand and tell her story as to why the securities at issue were not property of the estate.  Still, she

persisted in cross examining the Trustee and arguing with everyone in the room.  In the end, she never

took the stand to testify.[11]

        The hearing ended with Ms. Belenkova claiming that she had been denied due process because

she had not reached the point in the hearing for her to be sworn and to "tell her story" with regard to

the Turnover Motion.  Throughout the hearing, she conducted herself in an unduly contentious and

uncivil manner.  She consumed many hours with unnecessary argument and verbal attack on all

associated with the process.  She acted in a disrespectful and insulting fashion, alternating her verbal

assaults, insults, and disrespect on counsel, the Court, court staff, and the Trustee.  She interrupted

incessantly.[12]  She accused opposing counsel of acting in concert with other lawyers from her divorce

case and in using "lawyer tactics" calculated to mislead the court, none of which was borne out by the

record.  By the time the hearing ended, she had been physically restrained by court security and, on a

separate occasion, had been fined twice for repeatedly ignoring the simple directions of the Court

calculated to ensure a fair and efficient hearing.

---

[10] Trans. of 11/25/2013, p. 129.

[11] The Court believes that even if the hearing had continued for months, Ms. Belenkova would never have stopped arguing senselessly and taken the stand to testify.

[12] The written transcript does not fully capture this (and much else about her demeanor).  The audio record is needed to appreciate her manner and demeanor and the frequency and extent to which she felt free to talk over others, including the court, and to treat rulings and directions as not binding on her.

e.    **Claim of Exemption**

In the schedule of property claimed as exempt, known as Schedule C, that she filed with her bankruptcy petition, Ms. Belenkova did not assert a claim of exemption as to any securities or brokerage account.   On November 4, 2013, after Desmond had filed the Turnover Motion, she filed a motion to amend her Schedule C to claim as exempt her Scottrade Account and, more specifically, "311 AAPL stock."   Where the form called for her to "specify law providing each exemption, she indicated "11 U.S.C. § 522" without indicating any applicable subsection.  Where the form called for her to specify "value of claimed exemption," she indicated "varies on market value."  The motion to amend was not accompanied by a proper certificate of service or a signature declaration, and the Court issued a notice to that effect.    On November 12, 2014, she filed another motion to amend Schedule C, this time with the proper declaration and with a certificate of service showing service on Desmond only.  Two days later, she filed an "Amended Motion to Amend Schedule C, exempt assets," by which she seeks leave to file the same amended Schedule C as was filed with the November 4 motion (no other has ever been filed).  She indicates in this latest motion that the asset being claimed as exempt was not declared when she filed her bankruptcy petition on September 12, 2012, because it did not exist on that date, and "[t]his asset is not part of Bankruptcy estate."

On November 18, 2013, Desmond objected to the motions to amend Schedule C.  He argued that in view of Ms. Belenkova's knowing and intentional failure to disclose her brokerage holdings in her initial schedules, the proposed amendment of Schedule C is being made in bad faith and would be prejudicial to creditors and the estate and therefore should be disallowed.  To date, the Court has taken no action on the motions to amend Schedule C.

**FINDINGS OF FACT**[13]

a.      **Holdings at the Time of the Bankruptcy Filing**

Ms. Belenkova filed the petition commencing her bankruptcy case on September 12, 2012.  The

monthly Schwab statements for August and September 2012 show that, during those months, including

on the date of her bankruptcy filing, Ms. Belenkova had at least one open account at Schwab, Account

*14 (the "Schwab Account").  The account was open in her name, Irena Belenkova, not in the name of

her mother or of Astral Enterprises, Inc.   Each page of each of the Schwab Account statements that

comprised Trustee's Exhibit 2 identified the account that was the subject of the report as "Schwab One®

Account of IRINA BELENKOVA."   The account was a margin account.   Nowhere in the statements for this

account is there any indication that the account, or any part of it, was an IRA.

At the end of August 2011, this account held "equities" with a total market value of $333,611.10

and "other assets" of $66,200, had a margin loan balance of $285,950.63, and therefore had a net

account value (total assets minus margin loan balance) of $113,860.47.  The "equities" included 200

shares of Apple Inc. (AAPL), 450 shares of Caterpillar Inc. (CAT), 305 shares of Netflix Inc. (NFLX), and

5,000 of Parexel Intl. Corp. (PRXL).   The "other assets" consisted of 4,000 shares of Direxion SHS ETF

New (TZA).

The Schwab Account statement for September 2012 shows that prior to the petition date, four

transactions had settled in September 2012:  a sale of 1,200 shares of PRXL on 9/4/2012 at $28.32 per

shares, for total proceeds of $33,981.57; a sale of another 100 shares of PRXL on 9/4/12 at $28.31 per

share, for total proceeds of $2,830.30; a sale of another 3,700 shares of PRXL on 9/4/2012 at $28.30 per

share, for total proceeds of $104,702.51; and a purchase of 100 shares of AAPL on 9/5/2012 at $669.59

per share, for a total cost of $66,965.95.  A fifth transaction, commenced on 9/7/2012, settled on the

petition date, 9/12/2012:  a sale of 150 shares of CAT at $88.11 per share, for net proceeds of

---

[13] The procedural history is among the relevant facts, and I incorporate it by reference.

$13,209.25.[14] I therefore find that when Ms. Belenkova filed her bankruptcy petition on September 12, the Schwab Account held the following assets:  300 shares of AAPL, 300 shares of CAT, 305 shares of NFLX, and 4000 shares of TZA.

In addition to these shares, Ms. Belenkova held in her name additional shares in another account at Schwab (the "Second Schwab Account").  This is evident from the Schwab Account statement for October 2012, which shows that on October 11, 2012, the following shares were "journaled" into Schwab Account *14, the First Schwab Account:  46 additional shares of AAPL, 84 additional shares of NFLX, and 1,295 shares of Morgan Stanley (MS).  The Trustee having shown that these assets belonged to Ms. Belenkova on October 11, 2012, and Ms. Belenkova having neither denied owning these shares on the date of her bankruptcy filing nor introduced evidence that she acquired them postpetition, I find and conclude that she owned them, too, on the petition date.

Neither party has introduced into evidence the value of the Ms. Belenkova's securities on the precise date of the bankruptcy filing, but the Schwab statements show trading values of these securities near that date: at the end of each month, and on the dates on which transactions were effected. Among those values in the Schwab statements, I will use the value for the date closest to the petition date:  for AAPL, $697.56 (value on 9/17/12); for CAT, $87.70 (value at time of trade settled 9/13/12); for NFLX, $59.72 (value on 8/31/12); for TZA, $14.70 (value at time of sale settled 9/17/12); and for MS, $17.86 (value on 10/11/12).  Accordingly, as shown in the chart below, on the date of her bankruptcy filing, Ms. Belenkova owned some 6330 shares of stock having a total value of $335,844.30.

---

[14] I treat this transaction as having occurred prepetition because the Court's Electronic Case Filing system indicates that the bankruptcy petition was filed in the evening, at 7:02 p.m., after the close of regular business hours.

| ASSETS HELD AT TIME OF BANKRUPTCY FILING | | | |
|---|---|---|---|
| Stock | Shares | Share Price | Total |
| AAPL | 346 | $697.56 | $209,268.00 |
| CAT | 300 | $88.11 | 26,433.00 |
| NFLX | 389 | $59.72 | 18,214.60 |
| TZA | 4,000 | $14.70 | 58,800.00 |
| MS | 1,295 | $17.86 | 23,128.70 |
| Total | 6,330 | | $335,844.30 |

The net value of these holdings was the value of the stock minus the amount of the margin loan debt, which effectively constituted a lien in favor of the brokerage on the securities in the account. Therefore, as the Trustee concedes, to determine the value of Ms. Belenkova's interest in these securities at the time of her bankruptcy filing, it is also necessary to know the margin loan balance on the date of the bankruptcy filing.  The Schwab statements do not provide a daily balance of the margin loan, but they supply the data necessary to calculate, or at least closely approximate, that balance on the date of the bankruptcy filing.

Each sale of stock resulted in a reduction of the margin loan balance by the amount of the proceeds of the sale; and conversely each purchase of stock resulted in an increase of the margin loan balance by the amount of the purchase price.[15]  Accordingly, the Schwab account statement for September 2012 indicates that the margin loan balance decreased over the course of the month from its beginning balance of $285,950.63 to its ending balance of $182,629.08, a decrease of $103,321.55; this decrease is equal to the total sales over the course of the month minus the total purchases over the course of the month, $103,938.08, minus interest charged on the margin account, $616.53.  By the same method, it is possible to determine the margin loan balance on the petition date.  It is the beginning balance of $285,950.63, minus total sales through the date of bankruptcy filing [$33,981.57 + $2,830.80 + $104,702.51 + $13,209.25 = $154,724.13], plus total purchases through the date of the bankruptcy

---

[15] At no time did Ms. Belenkova invest new funds in this account.  It appears that all purchases were funded entirely with margin loans.

filing [$66,965.95], minus margin loan interest that accrued through the date of the bankruptcy filing

[roughly $308.26]:  $197,884.19.

The net value of the Schwab Account at the time of the bankruptcy filing was the value of the

securities in the account at the time of the bankruptcy filing, $335,844.30, minus the margin loan

balance at the same time, $197,884.19:  a net value of $137,960.11.

**b.      Ownership of Schwab Account**

Ms. Belenkova has asserted at various times that the securities in the Schwab Account on the

date of her bankruptcy filing were, though held in her name, not truly hers but (i) her mother's or (ii) the

property of her wholly-owned corporation, Astral Enterprises, Inc.  She has submitted no evidence to

support either proposition—much less attempted to reconcile the two, to say nothing of her third

explanation, that some of the funds in the account constitute an Individual Retirement Account (IRA)

that she is entitled to claim as exempt.  Desmond bears the burden of proof here, but he has sustained

his burden by showing that the Schwab Account was in her name, as were the later accounts with which

she replaced it, first at Interactive and then at Scottrade.  Without evidence to the contrary, this is

sufficient.  Ms. Belenkova's representations to the contrary in her various pleadings—these are not

evidence, but they are all she has ever advanced—are flatly incredible.  They are moreover contradicted

by her own statement, in her SOFA, that, at the time of her bankruptcy filing, there existed no "property

owned by another person that the debtor holds or controls."  For numerous reasons, I find her to be

wholly lacking in credibility on this point (ownership of the account assets) among many others.

Desmond has sustained his burden of proving that the assets in the Schwab account on the date of her

bankruptcy filing belonged to Ms. Belenkova alone, and that she was not holding or administering them

for  a third party.

c.    **Postpetition Disposition of Assets in Schwab Account**

Between the petition date and October 24, 2012, four transactions occurred on the Schwab

Account:   two sales of CAT on 9/13/12, 300 shares in all at $87.70 per share, for total proceeds of

$26,302.46; a purchase of 25 shares of AAPL on 9/20/12 at $697.28 per share; and a sale of 30 shares of

AAPL at $665.89 per share on 10/9/12, for net proceeds of 19,942.30.   Then, on October 24, 2012, Ms.

Belenkova transferred the remaining securities in this account—341 shares of AAPL, 3,500 shares of TZA,

1295 shares of MS, and 389 shares of NFLX—together with the margin loan debt that encumbered it, to

a new account in her name at Interactive (the "Interactive Account").  This left only $44.65 in cash in the

Schwab Account, and this cash too was transferred to the Interactive Account on November 5, 2012.

The Schwab statements give no indication that, after the filing of her bankruptcy petition, Ms. Belenkova

invested new money in that account.  The purchases completed postpetition were completed with some

combination of margin loans and the resources that existed in the account on the date of the

bankruptcy filing.

The information form for the Interactive Account indicates that this account, too,  was opened

in the name of Irina Belenkova; that Ms. Belenkova applied to open this account on October 17, 2012;

that Ms. Belenkova indicated to Interactive in the application that her estimated net worth and

estimated liquid net worth were "101,001 - 250,000," that her net income was "100,000 - 150,000," and

that her total assets were "101,001"; that the "customer type" was "individual"; and that for purposes

of United States taxes, the name on the tax return was Irina Belenkova.  Where it was possible to specify

a "business name, if different,"—i.e., different from the specified "name on tax return"—she did not

indicate a business name.  The Interactive Activity Statements for both 2012 and 2013 indicate that both

the "account type" and "customer type" were "individual."

The Interactive Activity Statement for 2012 corroborates that, in October 2012, Ms. Belenkova

transferred from the Schwab Account to the Interactive Account all the shares that had been in her

Schwab Account:  341 shares of AAPL, 3,500 shares of TZA, 1,295 shares of MS, and 389 shares of NFLX,

having a combined value when received by Interactive on 10/22/12 of $310,604.36.  The same

statement also corroborates that, on the same date, Ms. Belenkova transferred to Interactive a margin

loan debt in the net amount of $201,229.39 (after application of the late-transferred $44.65).

The Interactive Activity Statement for 2012 indicates that in November and December 2012, Ms.

Belenkova sold all the shares she held in stocks other than AAPL:  3,500 shares of TZA, 1,295 shares of

MS, and 389 shares of NFLX, for combined proceeds of $113,984.82.  After December 5, 2012, the

Interactive Account never again held stocks other than AAPL.  During these same months, Ms.

Belenkova, in a series of 7 sales and 6 purchases, sold 205 shares of AAPL and purchased 410 shares of

AAPL, a net investment in AAPL of $113,400.38.  She funded her purchase of new AAPL shares entirely

with margin loans and the net equity in her account; she invested no new monies in this account in

2012.  At the close of 2012, the Interactive Account held 546 shares of AAPL, valued on 12/31/12 at

$290,566.40, and was encumbered by margin loan debt of $200,039.56.

The Interactive Activity Statement for 2013 indicates that in a series of sales over the first four

months of 2013, Ms. Belenkova sold 280 shares of AAPL, for total sale proceeds of $122,340.10.  All of

this sum was used to pay down margin debt.  On August 15, 2013, Ms. Belenkova purchased 45 new

shares of AAPL; she funded this purchase, too, entirely with margin loans and the net equity in this

account.  She invested no new monies in this account in 2013.  As of September 18, 2013, the

Interactive Account held 311 shares of AAPL, valued at $141,604.52 and encumbered by margin loan

debt of $99,119.74.  On September 18, 2013, Ms. Belenkova transferred the 311 shares of AAPL,

together with margin loan debt of $99,119.74, to a new account in her name at Scottrade, the Scottrade

Account.

Ms. Belenkova completed her application to open an account at Scottrade on August 27, 2013,

seven days after Braunstein moved for authority to obtain records of her account at Interactive.  In this

23

application, she identified the applicant as herself, Irina Belenkova, and she signed it in her own name,

not as the officer of a corporation, and not as a trustee or custodian for her mother.  In a Scottrade

Options Application that she completed the same day, she indicated that she had annual income of

$155,000 and liquid assets of $900.  In a separate signature page that she signed and completed for

both applications on September 16, 2013, she again specified that the "name of account" was Irina

Belenkova.  Where she was required to indicate the "account type," and the options were "Individual,"

"Joint," and "IRA," she indicated "Individual."

The Scottrade account statement for September 2013 corroborates that on September 23,

2013, Ms. Belenkova transferred from her Interactive Account to her Scottrade Account 311 shares of

AAPL, with a total value of $148,269.25, and a margin loan balance of $99,119.74.  The only other

activity on the Scottrade Account in the remainder of September 2013 was the accrual of margin

interest debt in the amount, $93.61, for a margin loan balance at the end of the month of $99,213.35.

As of September 30, 2013, the last day for which I have evidence, the Scottrade Account held 311 shares

of AAPL at $476.75, for total value of $148,269.25, subject to margin debt of $99,213.35, for net account

value of $49,055.90.  No evidence has been presented of further activity on the account since that date.

The following table presents a chronological overview of the purchases and sales of AAPL stock

on Ms. Belenkova's accounts at Schwab and Interactive from the date of her bankruptcy filing, with a

running balance of the quantity of shares she held.  (There were no purchases of sales after the transfer

to Scottrade.)  Over this period, she sold a total of 515 shares, which is more than the 346 shares she

held on the petition date; however, because of offsetting purchases, at no time did the total number of

shares held in her accounts drop below 266.  Applying the "last in first out" method of identifying the

shares sold, I find that of the 311 shares remaining, 266 are shares Ms. Belenkova owned on the date of

her bankruptcy filing.

| Date | Purchases | Sales | Share Balance |
|---|---|---|---|
| 9/12/12 | | | 346 |
| 9/20/12 | 25 | | 371 |
| 10/9/12 | | 30 | 341 |
| 11/2/12 | | 10 | 331 |
| 11/7/12 | | 20 | 311 |
| 11/8/12 | | 20 | 291 |
| 11/13/12 | 200 | | 491 |
| 11/14/12 | | 40 | 451 |
| 11/16/12 | 30 | | 481 |
| 11/28/12 | 50 | | 531 |
| 12/5/12 | 50 | | 581 |
| 12/5/12 | | 40 | 541 |
| 12/7/12 | 50 | | 591 |
| 12/7/12 | | 50 | 541 |
| 12/17/12 | 30 | | 571 |
| 12/17/12 | | 25 | 546 |
| 1/15/13 | | 20 | 526 |
| 1/24/13 | | 100 | 426 |
| 1/24/13 | | 20 | 406 |
| 1/25/13 | | 10 | 396 |
| 1/25/13 | | 10 | 386 |
| 3/1/13 | | 20 | 366 |
| 3/4/13 | | 30 | 336 |
| 4/17/13 | | 40 | 296 |
| 4/17/13 | | 10 | 286 |
| 4/18/13 | | 20 | 266 |
| 8/15/13 | 45 | | 311 |
| **Total Purchased** | **480** | | |
| **Total Sold** | | **515** | |

**JURISDICTION**

The matter before the Court is a trustee's motion for turnover under 11 U.S.C. § 542(a).  It arises

under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the

district court in 28 U.S.C. § 1334(b) and, by standing order of reference (codified at L.R. 201, D. Mass.),

referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  This matter is a core proceeding within

the meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(E).  Under these statutes, the bankruptcy court has

authority to enter a final order on the motion.

**DISCUSSION**

Section 542(a) of the Bankruptcy Code provides as follows:

> Except as provided in subsection (c) or (d) of this section, an entity,
> other than a custodian, in possession, custody, or control, during the
> case, of property that the trustee may use, sell, or lease under
> section 363 of this title, or that the debtor may exempt under
> section 522 of this title, shall deliver to the trustee, and account for,
> such property or the value of such property, unless such property is of
> inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).  This subsection requires that an entity in possession, custody, or control of certain

property both (i) deliver to the trustee either the property or the value of the property and (ii) account

for the property.[16]  The obligation to deliver is what the parties have been referring to as—and what is

commonly known as—the obligation to "turnover."[17]  The obligations to turnover and account apply to

any and all property that satisfies three requirements:  (a) the property is in the entity's possession,

custody, or control; (b) the trustee may use, sell, or lease it under 11 U.S.C. § 363, or the debtor may

exempt it under 11 U.S.C. § 522; and (c) the property is not of inconsequential value or benefit to the

estate.  The obligations to turnover and account arise automatically, without need of court order; but a

trustee may move the court to enforce them.  11 U.S.C. § 105(a) ("The court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title.").  Where

the entity in question is the debtor, the trustee may proceed by simple motion and need not employ an

adversary complaint.  Fed. R. Bankr. P. 7001(1) (adversary proceedings include proceedings to recover

money or property *other than* proceedings to compel the debtor to deliver property to the trustee).  The

trustee bears the burden of proof as to the first two requirements. The party opposing turnover bears

the burden as to the third, "inconsequential value or benefit," which amounts to an affirmative defense.

---

[16] Subsection 542(a) is expressly subject to exceptions for matters within the scope of subsections (c) and (d), but neither is applicable here.  Also, it does not apply to an entity that is a "custodian" as that term is defined in 11 U.S.C. § 101(11), but neither Ms. Belenkova nor Scottrade is a custodian as so defined, and neither contends otherwise.

[17] The word "turnover" is not used in § 542(a).  I use the words deliver and turnover interchangeably, as have the parties.

*In re Stancil*, 473 B.R. 478, 485 (Bankr. D. D.C. 2012) (in an action for turnover, a showing that the

property is of inconsequential value or benefit to the estate is an affirmative defense); *In re Burgio*, 441

B.R. 218, 220 (Bankr. W.D.N.Y. 2010) (because it involves an exception to the general rule of turnover,

the burden of showing inconsequential value would fall upon the debtor).

Here, there is no dispute as to the first of the three requirements, and in any event I find that

this requirement is satisfied.  Ms. Belenkova was undisputedly in control of the Schwab accounts on the

petition date; and, subject only to the present escrow order, she is in control of the Scottrade account.

Scottrade, too, has custody and control of the assets in the Scottrade account.  Likewise, there is no

dispute as to the third of the three requirements:  the property in question is not of inconsequential

value to the estate.  On the date of the bankruptcy filing, the assets Ms. Belenkova held at Schwab had a

gross value of $335,844.30 and a net value of $137,960.11; and the Scottrade Account now has assets

with a gross value of $148,269.25 and net value of $49,055.90.  Even by the smallest of these numbers,

$49,055.90, the amount in question is not inconsequential to the bankruptcy estate.

Only the second requirement is in dispute.  It is satisfied if either (i) the trustee may use, sell, or

lease the property under 11 U.S.C. § 363 or (ii) the debtor may exempt under 11 U.S.C. § 522.  Property

that a trustee may use, sell, or lease under § 363 is property of the bankruptcy estate.  11 U.S.C. §

363(b)(1) and (c)(1) (permitting trustee to use, sell, or lease "property of the estate").  In relevant part,

property of the estate includes "all legal or equitable interests of the debtor in property as of the

commencement of the case," 11 U.S.C. § 541(a)(1), and "[p]roceeds, product, offspring, rents, or profits

of or from property of the estate, except such as are earnings from services performed by an individual

debtor after the commencement of the case," 11 U.S.C. § 541(a)(6).  Likewise, property that the debtor

may exempt under 11 U.S.C. § 522 is a subset of the property of the estate and is therefore necessarily

property of the estate.  11 U.S.C. § 522(b)(1) ("Notwithstanding section 541 of this title, an individual

debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the

alternative, paragraph (3) of this subsection.").  The statute expressly requires turnover of property that

the debtor may exempt, and therefore it is no defense to turnover that the property in question is

claimed as exempt; I therefore reject Ms. Belenkova's contention to the contrary.[18]

Desmond may prevail here by establishing any one of three things:  (i) that the Scottrade assets

were among the assets that Ms. Belenkova owned and held in her Schwab Accounts on the date of her

bankruptcy filing; (ii) that the Scottrade Assets are proceeds of the assets that Ms. Belenkova owned and

held in her Schwab Accounts on the date of her bankruptcy filing; or (iii) that the value of the Scottrade

assets is less than or equal to the assets that Ms. Belenkova owned and held in her Schwab Account on

the date of her bankruptcy filing.  Ms. Belenkova makes essentially three arguments in opposition.  First,

the assets she held in her Schwab Account on the date of her bankruptcy filing did not belong to her but

to a third party: either her wholly-owned business, Astral Enterprises, Inc. (as she has sometimes

contended) or her mother (as she initially contended).  Second, even if the assets she held in her Schwab

Account on the date of her bankruptcy filing did belong to her, and for that reason became assets of her

bankruptcy estate, the Scottrade assets are neither those assets nor proceeds of them.  Third, she

contends that the assets are exempt.

### a.        Whether the Schwab Assets were Property of the Estate

The threshold issue is whether the assets that Ms. Belenkova held in her Schwab Accounts on

the date of her bankruptcy filing belonged to her (as the Trustee contends) and not to a third party (as

Ms. Belenkova contends).  If they did belong to her, the trustee is entitled to turnover of the assets

themselves and their proceeds or, to the extent that either they or their proceeds are no longer capable

---

[18] I need not and do not now rule on whether she may amend her schedule of exemptions to claim any portion of
the Scottrade account as exempt.  If she were permitted to amend schedule C, she would thereby be permitted to
assert a claim of exemption.  Interested parties would then have a period of time to object to the claimed
exemption.

of being turned over, their value.  If they were not her assets but belonged to another, the trustee is

entitled to no relief here at all.

Desmond, as a trustee seeking turnover, bears the burden of showing that the assets in the

Schwab Accounts on the date of the bankruptcy filing belonged to Ms. Belenkova.  He has sustained that

burden by showing that the assets were in accounts in her name.  Section 541(d) excludes from the

bankruptcy estate the equitable interest in any property in which the debtor holds, as of the

commencement of the case, only legal title and not an equitable interest.  11 U.S.C. § 541(d) ("Property

in which the debtor holds, as of the commencement of the case, only legal title and not an equitable

interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the

extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such

property that the debtor does not hold.").  And § 541(b)(1) further excludes from the estate "any power

that the debtor may exercise solely for the benefit of an entity other than the debtor."  11 U.S.C. §

541(b)(1). Ms. Belenkova has submitted no evidence to support her contention that the equitable

interest in the Schwab assets resided in someone other than herself, the party in whom legal title clearly

was vested.  Nor has she adduced evidence that her powers over the Schwab Accounts were for the

benefit of another, much less exercisable *solely* for the benefit of another.  Her own representations on

that subject are not evidence, not consistent, and not credible.  Accordingly, the assets in the Schwab

Accounts on the date of the bankruptcy filing belonged to Ms. Belenkova and, upon the filing of the

bankruptcy petition, became property of the estate through § 541(a)(1).

**b.      Whether the Scottrade Assets were among the Schwab Assets**

The second issue presented is whether the assets presently in Ms. Belenkova's Scottrade

Account were among the assets that Ms. Belenkova held in her Schwab Accounts on the date of her

bankruptcy filing, which I have concluded became property of her bankruptcy estate.  If so, then the

Scottrade assets are themselves property of the estate and for that reason must be turned over.  Ms

Belenkova contends that the 311 shares of AAPL that constitute her Scottrade assets are not the same shares of AAPL as she held at the time of her bankruptcy filing.  Those that she held at the time of her bankruptcy filing have been sold, and the present shares were later acquisitions.  Desmond offers no answer to this argument.

Ms. Belenkova can be correct only if the inventory of AAPL stock is accounted for using the "first in first out" (FIFO) method:  the assumption that each sale was of the oldest share in the inventory at the time of the sale. Ms. Belenkova offers no justification for use of FIFO here.  Especially where she was trading in estate assets without authority, in knowing contravention of the rights of creditors and the trustee under the Bankruptcy Code, FIFO is self-serving and inappropriate.  The Court accordingly adopts the alternate "last in first out" (LIFO) method, the assumption that each sale was of the shares most recently acquired.  Given that the inventory of AAPL stock dipped as low as 266 but never lower, it follows from the LIFO method that of the 311 shares remaining, 266 are shares Ms. Belenkova owned on the date of her bankruptcy filing and, as such, are property of her bankruptcy estate and must be turned over.

As to the remaining 45 shares of AAPL presently held in the Scottrade Account, I agree with Ms. Belenkova that they are not among the shares she owned on the date of her bankruptcy.  That alone does not mean that these 45 shares are not property of the estate; the Trustee contends that these 45 shares (and indeed any that the Court determines were not among those owned at the time of the bankruptcy filing) are property of the estate because, if they are not the same shares as Ms. Belenkova held on the petition date, they are *proceeds* of stock she held on that date.  However, it does mean that these 45 shares can be deemed property of the estate only if and to the extent that they are shown to be proceeds of stock that Ms. Belenkova held on the petition date.  I turn now to that issue.

c.      **Whether the Shares Acquired Postpetition are Proceeds of Property of the Estate**

Subject to an exception that I will address below, property of the estate includes "[p]roceeds,

product, offspring, rents, or profits of or from property of the estate[.]"  11 U.S.C. § 541(a)(6).  Desmond

contends that, if (and to the extent that) the present shares are not among those Ms. Belenkova owned

on the petition date, they are at least proceeds of those shares because they were acquired with

proceeds from their sale and from dividends they paid on the existing shares.  Ms. Belenkova disagrees,

arguing that the proceeds and dividends were in every instance wholly used to pay down margin debt

and that the new purchases were made entirely with new credit, not old equity.

On the facts, I agree with Ms. Belenkova to a limited extent.  It does appear that the proceeds of

each and every sale of stock were used to pay down margin debt. However, it does not follow that the

new shares are not proceeds from sale of the old.  At no time did Ms. Belenkova invest new monies in

her brokerage accounts after her bankruptcy filing.  It follows that any credit she obtained—and used to

purchase new stock—is credit she obtained with the equity that remained in her account on the date of

the bankruptcy filing.  Margin lending is never done on a 100% loan-to-new-asset ratio.  The margin

lender will lend only with the comfort of a "margin"—excess value in the stock portfolio to protect the

lender against loss.[19]  It is this excess value, the equity in the account on the date of the bankruptcy

---

[19] See Black's Law Dictionary, p. 966 (6th ed. 1990), definitions of "margin account," "margin transaction," and "margin requirement," and "margin."  "Margin account" is defined as follows:

> Securities industry's method of extending credit to customers.  Under such practice customer purchases specified amount of stock from securities firm by advancing only portion of purchase price, with brokerage firm extending credit or making loan for balance due, and firm maintains such stock as collateral for loan and charges interest on balance of purchase s price.  Margin account requirements are specified by regulations of Federal Reserve Board.  See 15 U.S.C.A. § 78g.

A "margin transaction" is defined as "[t]he purchase of a stock or commodity with payment in part in cash (called the margin) and in part by a loan."  "Margin requirement" is defined as "[t]he percentage of the purchase price that must be deposited with a broker to purchase a security on margin.  The margin requirement is set or adjusted by the Federal Reserve Board."  And "margin" is defined as follows:

filing, that enabled Ms. Belenkova to make the purchases. Each new purchase was made with a combination of the equity remaining in the account (that is, the value of the stock holdings in excess of the margin debt) and new credit, and even the credit was purchased with the existing equity.  The new shares are therefore proceeds of the stock held on the petition date. [20]

The rule that proceeds of property of the estate are themselves property of the estate is subject to an exception for such proceeds "as are earnings from services performed by an individual debtor after the commencement of the case."  11 U.S.C. § 541(a)(6).  Ms. Belenkova contends that the equity in the Scottrade Account, if it constitutes proceeds of property of the estate, is the product of her postpetition purchases and sales of stock and, as such, "earnings from services" she performed after the commencement of the case within the meaning of subsection 541(a)(6).  This argument might present an interesting question of law if in fact Ms. Belenkova's unauthorized trading of estate assets had in fact increased the net value of her account.  In fact, however, her efforts resulted in a reduction of net equity from $137,960.11 on the petition date to $49,055.90, a net loss of $88,904.21.  I therefore need not address this argument.  There are no "earnings" that might be excluded under this exception.  I conclude that the new shares are proceeds of property of the estate and, as such, are themselves property of the estate and must be turned over.

### d.    The Value of Property of the Estate

I have concluded that the assets that Ms. Belenkova held in her Schwab Account on the date of her bankruptcy filing were her own, not property she was holding or administering for another, and that

---

A sum of money, or its equivalent, placed in the hands of a broker by the principal or person on whose account a purchase or sale of securities is to be made, as a security to the former against losses to which he may be exposed by subsequent fluctuations in the market value of the stock.  The amount paid by the customer when he uses his broker's credit to purchase a security.

[20] I make this conclusion as to the 45 shares that I have determined are not among those Ms. Belenkova owned on the petition date, but the same conclusion would apply to every share she presently holds if none of her present holdings were deemed to be among those she owned on the petition date.

these assets had a net value of $137,960.11.  Even if the Scottrade assets were neither the same as the

assets she was holding on the date of her bankruptcy filing nor proceeds thereof, Desmond would be

entitled to their turnover in full because he is entitled to turnover not just of property of the estate but,

in the alternative, to "the value of such property," 11 U.S.C. § 542(a), and the value of the Scottrade

assets is less than that of the assets she held on the date of her bankruptcy filing and should have but

did not turnover.  That is, Desmond is entitled to turnover of other, non-estate assets in lieu of those

that should have been turned over, up to the value of the latter.  I have found that the assets in the

Scottrade Account when they were placed in escrow had a net value of $49,055.90, which is well below

even the *net* value of the Schwab assets on the date of the bankruptcy filing, $137,960.11.[21]

### e.    Conclusion

For the reasons articulated above, Desmond is entitled to turnover of the Scottrade Account in

full.  A separate order will enter accordingly.

Date:  March 24, 2014

_____
Frank J. Bailey
United States Bankruptcy Judge

---

[21] Therefore I need not decide whether the value that the trustee may recover under § 542 is the gross value of the Schwab assets on the date of the bankruptcy filing or their net value.